## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

THERESA MASON-FUNK,
individually and in her capacity as the
Special Administrator of the Estate of
Michael L. Funk,

                Plaintiff,

      v.                                    Case No:  16-CV-978

CITY OF NEENAH,
a Wisconsin municipal corporation,
CRAIG HOFFER and
ROBERT ROSS,

                Defendants.

## DEFENDANTS' MEMORANDUM IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, City of Neenah, Craig Hoffer, Robert Ross, by their attorneys, Gunta Law

Offices, S.C., submit this Memorandum in Support of their Motion for Summary Judgement.

## INTRODUCTION

Plaintiff, Theresa Mason-Funk ("Plaintiff"), asserts several causes of action against

defendants Hoffer and Ross: (1) an alleged violation of 42 U.S.C. § 1983 "by seizing Michael

maliciously, intentionally and/or with reckless regard of his rights, depriving him of liberty, and

shooting him and causing his death without reasonable basis or any legitimate governmental

interest."  (Docket # 13, Am. Cmplt. ¶51)  Additionally, Plaintiff claims "Michael did not present

an imminent threat of harm to Officers Hoffer and Ross or to any other person at any time during his

attempted escape from Flatoff."  (Am. Cmplt. ¶52)  Finally, Plaintiff claims that "the conduct of

Officers Hoffer and Ross violated clearly established constitutional rights of which reasonable officers knew or should have known." (Am. Cmplt. ¶53)

In addition to her § 1983 claim, Plaintiff asserts a state law wrongful death claim, alleging that "the conduct of Officers Hoffer and Ross constituted wrongful acts of battery that caused Michael's death," the battery "was committed within the scope of their employment," and the battery "was committed maliciously, intentionally and/or in reckless disregard of Michael's . . . rights," actionable under Wis. Stat. §§ 895.01, 895.03 and 895.04. Finally, Plaintiff asserts an indemnity claim against the City of Neenah under Wis. Stat. § 895.46.

Defendants now move for summary judgment seeking dismissal of all of Plaintiff's claims.

## DISCUSSION

### Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party has the initial burden to demonstrate that it is entitled to judgment as a matter of law - - that no reasonable jury could reach a verdict in favor of the non-moving party. *Celotex, supra,* 477 U.S. at 323*; Matsushita Electronics, Co., Ltd., v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial.") In making its determination, the court must view the record in the light most favorable to the non-moving party, but "only if there is a 'genuine' dispute as to those facts." *Matsushita,* 475 U.S. at 587. The mere existence of some alleged factual dispute will not defeat summary judgment. The

requirement is there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-248 (1986).

I.   **Plaintiff's Fourth Amendment Claim Must Be Dismissed Because The Defendant Officers Use of Deadly Force Was Not Excessive or Unreasonable.**

A.   **Fourth Amendment Excessive Force Law.**

A claim that law enforcement officers used excessive force to effect a seizure is governed by the Fourth Amendment's "reasonableness" standard. *Plumhoff v. Rickard,* 134 S. Ct. 2012, 2020 (2014), citing *Graham v. Connor*, 490 U.S. 18 (1989), and *Tennessee v. Garner,* 471 U.S. 1 (1985). In *Graham,* 490 U.S. at 396-97, the Court held:

> "[T]he test of reasonableness under the Fourth Amendment . . . requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . ([T]he question is whether the totality of the circumstances justifies a particular sort of seizure.
>
> The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . . The Fourth Amendment is not violated by an arrest based on probable cause, even though the wrong person is arrested . . ., nor by the mistaken execution of a valid search warrant on the wrong premises. . . . With respect to a claim of excessive force, the same standard of reasonableness at the moment applies: "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers" . . . violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often faced with split-second judgments - - in circumstances that are tense, uncertain, and rapidly evolving - -  about the amount of force that is necessary in a particular situation.
>
> As in other Fourth Amendment contexts, however, the "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."

*See also County of Los Angeles v. Mendez,* __ U.S. __ (May 30, 2017) ("Excessive force claims are evaluated for objective reasonableness based upon the information the officers had when

the conduct occurred. That inquiry is dispositive: When an officer carries out a seizure that is reasonable, taking into account all relevant circumstances, there is no valid excessive force claim"); *Saucier v. Katz,* 533 U.S. 194, 204-205 (2001) ("The reasonableness of an officer's belief as to the appropriate level of force should be viewed from an on-scene perspective").

> With respect to the exercise of deadly force, the same principles govern:
>
> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Tennessee v. Garner,* supra, 471 U.S. at 11-12. *See also White v. Pauly,* 137 S. Ct. 548, 551 (2017) ("The reasonableness of an officer's use of force depends, in part, on whether the officer was in danger at the precise moment he used force . . ., and if the suspect threatens the officer with a weapon, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given."); *Scott v. Harris,* 127 S. Ct. 1769, 1777-78 (2007) ("Whether or not Scott's actions constituted application of 'deadly force,' all that matters is whether Scott's actions were reasonable . . . [W]e must consider the threat to the public that Scott was trying to eliminate . . . . It is clear from the videotape that respondent posed an actual and imminent threat to the lives of . . . . pedestrians . . . . and to officers."); *City and County of San Francisco v. Sheehan,* 135 S. Ct. 1765, 1775 (2015) ("The Fourth Amendment standard is reasonableness, and it is reasonable for police to move quickly if delay would gravely endanger their lives or the lives of others. This is true even when, judged with the benefit of hindsight, the officers may have made some mistakes."); *Ryburn v. Huff*, 132 S. Ct. 987, 991-92 (2012) ("Judges should be cautious about second guessing a police officer's assessment, made on the scene, of the danger presented by a particular situation.").

Applying the above principles, courts in this Circuit have held that what is critical "is the amount and quality of information known to the officer at the time he fired his weapon .... When an officer believes that a suspect's actions place him, or those in the immediate vicinity, in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force. ... What is important is the amount and quality of the information known to the officer at the time he fired his weapon. . . ." *Weinmann v. McClone*, 787 F.3d 444, 449 (7th Cir. 2014). *See also Scott v. Edinburg* 346 F.3d 752, 756 (7th Cir. 2003) ("The fact-specific nature of whether an officer used excessive force depends on the totality of the circumstances surrounding the encounter… Where the officer has reasonable cause to believe the suspect poses a threat of serious physical harm, either to the officer or others, it is not unreasonable to prevent escape by using deadly force.... Consequently, when an officer believes that a suspect's actions place him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force."); *Ford v. Childers,* 855 F.2d 1271, 1275 (7th Cir. 1988) (under the objective reasonableness standard, if it appears that an individual poses a serious threat of death or significant bodily harm, deadly force may be used if any misinterpretation of what appeared to be the case was reasonable under the particular facts and circumstances); *Helman v. Dulaime,* 742 F.3d 760, 763 (7th Cir. 2014) (Shooting suspect reaching for firearm is objectively reasonable); *Henning v. O'Leary,* 477 F.3d 492, 495 (7th Cir. 2007) ("Deadly force…is reasonable where an officer has probable cause to believe the suspect poses a danger of serious bodily harm, such as when the officer believes the suspect has a weapon or has committed a violent crime."); *Conley-Eaglebear v. Miller,* (No. 1:2014cv1175 (E.D. Wis. 2016)) (officer shooting suspect in back as he was beginning to turn toward officer with a gun in his hand was justified in doing so because the suspect posed a serious threat of physical harm in making this movement).

Of the factors employed in making the "reasonableness" determination, the most important is the immediacy of the threat posed by the suspect, especially where the case involves an armed confrontation with officers. *See e.g. Plakas v. Drinski*, 19 F.3d 1143, 1146, 1149-50 (7th Cir. 1994) ("This is not a case where the officer claims to have used deadly force to prevent an escape. . . . It is a self-defense case where the officer has 'probable cause' to believe that the suspect posed a significant threat of death or serious physical injury to the officer and, therefore, the officer may use deadly force."); *Mararvilla v. US,* 867 F. Supp. 1363, 1370, 1375 (N.D. Ind. 1994), aff'd 60 F.3d 1230 (7th Cir. 1995) ("In determining the reasonableness of the officer's conduct, the focus is on the very moment when the officer makes the 'split-second judgment' that leads to the use of deadly force. . . . [I]n a 1983 action based on a police shooting, a reasonable belief that danger exists may be formed by reliance on appearances . . . The speed with which the agents had to react to the situation before them further supports the reasonableness of their reaction. . . . [B]ecause reasonableness in excessive force cases is determined by reference to the situation as it appears to the officer at the very second that the officer decides to use force . . . any dispute over whether the agents had a wrong impression [of the plaintiff] is not material to the propriety of the agent's response. . . . )

With respect to the other significant Fourth Amendment factor - - the "feasibility" of warning a suspect prior to exercising deadly force, *see Garner, supra*, 471 U.S. at 11-12, and *Edinburg, supra*, 346 F.3d at 756, courts have held that a warning is "feasible" only if prior to an otherwise justifiable use of deadly force, the officer has time to issue a verbal warning without increasing the risk of harm the suspect poses to the officer or those in the immediate vicinity of the officer - - a warning is not required where it might increase the likelihood an armed suspect would be able to target the officer or others nearby, and fire his weapon, especially where the officer reasonably

believes the suspect has fired on officers after a prior warning, or warnings. *See e.g.*, *Maravilla,*

*supra*, 867 F. Supp. at 1378-79, aff'd 60 F.3d 1239 (7th Cir. 1995) ("Feasible means capable of being

performed without prolonging or compounding the threat presented by the suspect. Given the fact

the next second could have brought death to . . . agents on the ground or second floor, warning [the

suspect] before shooting him was not feasible so as to be constitutionally mandatory."); *Liebenstein*

*v. Crowe,* 826 F. Supp. 1174, 1186-87 (E.D. Wis. 1992) ("Where it is unclear whether a warning

would result in further violence and perhaps bloodshed, it is not apparent that a warning would have

been feasible."); *see also*, *Ridgeway v. City of Woolwish Twp. Police Dept.,* 924 F. Supp. 653, 659-

60 (D.N.J. 1996) (Warning not feasible if suspect knew of police presence, and if "officer reasonably

believes, based on suspect's prior conduct, that such a warning could provoke suspect to engage in

violent and life-threatening behavior, or to increase his or her effort to flee. . . .  In the split-second

reality of a deadly police chase, that warning . . . might permit the suspect to turn and fire a weapon

or otherwise facilitate his escape, putting at risk innocent police and civilians who he encounters in

the path of his flight. . . . Officer Ladd could have reasonably concluded that [the suspect] knew

deadly force might be used against him. . . . Ladd could have reasonably concluded that the issuance

of a warning could cause [the suspect] to turn and use his weapon in a manner that would threaten

the officer or others.")

As is the case with all Fourth Amendment issues involving the use of deadly force, the

critical component of analysis is time.  As the Sixth Circuit Court of Appeals observed in *Smith v.*

*Freland*, 954 F.2d 343, 347 (6th Cir. 1992):

> All parties agree that the events in question happened very quickly.  Thus, under
> *Graham*, we must avoid substituting our personal notions of proper police procedure
> for the instantaneous decision of the officers at the scene.  We must never allow the
> theoretical, sanitized world of our imagination to replace the dangerous and complex
> world that policemen face every day.  What constitutes 'reasonable' action may seem

quite different to someone facing a possible assailant than to someone analyzing the question at leisure."

Where an officer reasonably believes that a warning would only serve to increase the risk of harm to himself or others given the circumstances and limited time parameters involved, a warning is not required.

**B.      No Reasonable Jury Could Find That Officers Hoffer And Ross Violated Mr. Funk's Fourth Amendment Rights.**

The critical Fourth Amendment issues in this case are:

(1) whether it was unreasonable for Officers Hoffer and Ross to believe Mr. Funk was a likely participant in a police ambush or a hostage-taker when they first observed him alongside the vehicle in the alley with a drawn handgun, apparently searching for targets, especially when they had previously had been shot at after announcing their presence and ordering everyone in Eagle Nation to discard any weapons, show hands, and lie flat on the floor;

(2) whether it was unreasonable for Officers Hoffer and Ross to believe that at the time Mr. Funk pivoted in their direction with gun in hand, causing them to discharge their weapons, he posed an imminent threat of death or serious bodily injury to themselves and other officers in Mr. Funk's immediate vicinity; and

(3) whether a warning was feasible, and should have preceded the shooting, despite Officer Hoffer's and Ross's belief that Mr. Funk was a likely participant in a police ambush or a hostage taker who had previously fired upon them after being informed of their presence and being instructed to drop all weapons, and despite the fact that the officers had only two to three seconds between the time they first observed Mr. Funk in the alley, apparently searching for targets with gun in hand, and his

subsequent turning movement in their direction, triggering the officers' determination

that he posed an imminent threat of death or serious bodily harm to themselves and

the other officers in the vicinity.

Defendants respectfully submit that given the unique circumstances present in this case, a reasonable

jury could not find for plaintiff on any of these discrete Fourth Amendment issues.

Officers Hoffer and Ross reasonably determined that Mr. Funk was likely a participant in a

police ambush or a hostage-taker, who previously fired at police after multiple warnings, and posed

an imminent threat of death or serious bodily injury to the officers and others when they employed

deadly force. (DPFF 1, 3, 6, 34, 42-44) Under the particular facts and circumstances confronting

Officers Hoffer and Ross, another warning to Mr. Funk was not feasible.

> 1. Officers Hoffer and Ross Reasonably Believed They
>    Had Been Ambushed, There Was Likely More Than
>    One Shooter, and Mr. Funk Was Likely a Hostage-
>    Taker or Ambush Participant.

Based upon their collective experience and training, it was reasonable for the officers to

process what they had just experienced inside of Eagle Nation as an ambush. They entered the

building and immediately were presented with a complex situation, including encountering a "den

of stuff" that forced them to get "bogged down in a fatal funnel," (DPFF 83, 84) and then, after

identifying themselves and ordering everyone to show hands and get down (DPFF 34, 41),

encountered a flurry of gunfire being directed at them while they were so confined. (DPFF 40, 41,

45) Officers had approximately eight seconds to assess the situation upon making entry into the

building prior to the large amount of gunfire being directed at them, resulting in one officer being

struck in the head. (DPFF 45, 85)

The first two officers to enter, without obvious cause, quickly disappeared into the basement.

The remaining three were confined. These conditions, coupled with the rapidity and volume of

gunfire, the appearance of persons apparently using objects as cover, the distinct absence of compliance with police commands, and the introduction of an obscuring white cloud in the building, would lead a reasonable officer to conclude the Hasty Team had been caught in an ambush situation likely involving more than one shooter. (DPFF 34-42, 44, 86) Of further significance was Officer Hoffer's belief: "I believed at that time, with the amount of gunfire that was coming at us, that multiple people were shooting at us just because of the sheer number of bullets and rounds or the shots that I heard." (DPFF 45) Given the facts facing the officers, it was not only reasonable for Officers Hoffer and Ross to conclude they likely had been ambushed, and that the individual they later learned was Mr. Funk was either a participant in that ambush, or a hostage-taker. Mr. Funk did not act consistent with what a reasonable officer would conclude was a hostage attempting to escape. Mr. Funk did not call out, "Don't shoot," or "Help," or say anything seeking assistance. He did not put his hands up nor did he keep them in plain sight as did other hostages who left the building subsequent to Funk being shot. (DPFF 87)

        2.        **Officers Hoffer and Ross Reasonably Believed Mr. Funk Posed an Imminent Threat When He Turned In Their Direction With a Gun In His Hand, Justifying The Use of Deadly Force.**

In the critical 10 second period at issue on this case, approximately 9:45:30 to 9:45:40, Officers Hoffer and Ross were behind Vicky's Beauty Salon, and not in position to see down the alley. They responded to the sound of multiple shots fired, and moved to a position where they could assess the situation. (DPFF 88-90) They did not see Mr. Funk exit, fall on the ground in front of the truck, get up, or draw the gun from his holster. (DPFF 88) They first saw him as he was moving backwards down the driver's side of the truck, closing the distance between them, with the gun already in his hand. (DPFF 90) From the time Mr. Funk armed himself and started his spinning movement toward Officer Hoffer's and Officer Ross's position, there were

approximately three seconds that elapsed for Officers Hoffer and Ross to process their observations and make the conscious decision to use deadly force. (DPFF 91) In those three seconds, Officers Hoffer and Ross needed to observe the situation, orient themselves to what was occurring, assess the level of threat present, decide upon the appropriate response, and act upon their decision. (DPFF 92)

The actions of the armed Mr. Funk, looking in the direction of other officers near Gord's Pub, presented an imminent threat to those officers. (DPFF 93) Officers Hoffer and Ross observed the armed subject making a spinning movement toward their location with a firm grip on a handgun, and feared for their lives and the lives of the other officers. (DPFF 94)

When Officers Hoffer and Ross moved into a position to observe the area, they saw what they believed was an armed suspect. They believed the suspect was attempting to acquire a target and posed a threat to other officers positioned near Gord's Pub. They then observed the suspect make a spinning move in their direction, posing an imminent threat to them. Approximately three seconds elapsed from the time Officers Hoffer and Ross first observed the armed subject until they made the decision to employ deadly force. Their necessarily quick decision was based upon the subject's behavior which they perceived as a threat of death or great bodily harm to themselves or other officers. That decision, in consideration of all circumstances present, was reasonable.

> 3. Officers Hoffer and Ross Reasonably Concluded That Providing Mr. Funk With Another Warning In The 2-3 Seconds Prior to Having to Use Deadly Force Was Not Feasible.

Based upon the totality of the circumstances in this incident, it was not feasible for Officers Hoffer or Ross to provide a warning to Mr. Funk prior to employing deadly force. In fact, doing so may have placed them and other officers in greater danger. Additionally, there

was an extremely limited amount of time in which Officers Hoffer and Ross had to decide whether or not to give a warning. The officers' failure to provide additional warnings was reasonable and appropriate.

Mr. Funk was provided warning of the presence of police when the Hasty Team entered the rear door of Eagle Nation attempting a crisis hostage rescue. Captured on Officer Ross's body camera was the following upon the officers entering the building:

"POLICE"

"GET DOWN"

"GET DOWN"

"GET ON THE GROUND RIGHT NOW"

"SEE YOUR HANDS"

"AAHH I'M HIT"

"BACK OUT BACK OUT"

(DPFF 34) These commands were ignored; the officers were shot at in response to the commands being given. (DPFF 39, 41-44, 48)

With respect to the exact timing of the critical events, the Neenah Police Department Squad 1 video, shows that at [9:45:30] gunshots begin to ring out. At [9:45:31] there is a continuation of gunshots heard and Mr. Funk is seen suddenly exiting and falling outside the door in front of the pickup truck parked at the rear of the building. (DPFF 67) Of significance in this matter is that at that point, Officers Hoffer and Ross had only heard the multiple gunshots and had no direct visual observations of the alley area or Mr. Funk. (DPFF 68, 69, 88, 90) The specific timeframe of Officer Hoffer's and Officer Ross's observations leading up to the shooting of Mr. Funk is [9:45:36 – 9:45:39]. (DPFF 67)

It was not feasible for Officers Hoffer or Ross to provide a warning to Mr. Funk prior to employing deadly force. Doing so would have potentially placed officers in greater danger since there was no way for the officers to have known the subject's response to being warned. Earlier attempts at verbalization resulted in shots being fired at police. Further, and more concretely, there was precious little time to give such a warning.

Intent exists in a person's mind, and therefore can't be known. Instead, it must be inferred through observed behaviors, statements, and other information made available to police. It was reasonable and appropriate for Officers Hoffer and Ross to believe Mr. Funk had intent based on the prior attempts by the people in the building to kill police. The fact that Funk was armed and spinning in their direction weighed heavily. Intent was reasonably and logically inferred.

Additionally, the extreme time limitation in which Officers Hoffer and Ross had to decide based upon the totality of the circumstances is significant. There was approximately a 3-second timeframe in which Officers Hoffer and Ross observed Mr. Funk's actions, movements, mannerisms, and of significance, determined him to be armed immediately preceding multiple gunshots being fired and turning towards them. Within this 3-second timeframe Officers Hoffer and Ross had to observe, orient, decide and act. It was not tactically feasible to provide a verbal warning before shooting Mr. Funk. Officer Hoffer also testified that he was observing the subject's actions in the alley and he was concerned that the subject was attempting to locate a target. (DPFF 72) It wasn't until he saw the handgun and Mr. Funk beginning to turn that Officer Hoffer made the decision to use deadly force.

Case 1:16-cv-00978-WCG   Filed 07/14/17   Page 13 of 21   Document 23

4. Neither Officer Hoffer Nor Officer Ross Made The Decision To Temporarily Delay Providing Medical Treatment/Assistance To Mr. Funk. In Any Event, That Decision Was Reasonable and Did Not Result In Mr. Funk's Death.

With respect to Plaintiff's claim that Defendants unreasonably delayed providing medical assistance to Mr. Funk, that the decision to temporarily delay an immediate rescue/recovery or rendering medical aid to Mr. Funk in the alley after being shot by Officers Hoffer and Ross was reasonable and appropriate, based upon adequate justification, and consistent with a prudent and properly trained law enforcement officer facing these or similar circumstances.

There is no evidence that the alleged unreasonable delay in providing medical assistance to Mr. Funk caused his death.

Significantly, Officers Hoffer and Ross were subordinate to Team Leader Kuffel and they continued to coordinate with and follow his direction. The decision regarding the timing of rendering aid to the subject in the alley rested with Team Leader Kuffel, not with Officers Hoffer or Ross. (DPFF 80) Team Leader Kuffel's decisions-making priorities based upon the circumstances were reasonable and appropriate. This is because the officers viewed a weapon in or near Mr. Funk's hand and they had no way of knowing if Mr. Funk was awaiting an opportunity to attack them. (DPFF 96) The scene was not secure; officers were still at risk of gunfire by a suspect or suspects still inside the building, making it tactically unsafe to approach Mr. Funk without adequate cover and support. (DPFF 97)

II. **Even if, *Arguendo*, Officers Hoffer and Ross Could be Found to Have Violated Mr. Funk's Fourth Amendment Rights, Each is Entitled to Qualified Immunity**.

Once a defendant pleads qualified immunity, courts engage in a two-step analysis: (1) does the alleged conduct constitute a Fourth Amendment violation, and (2) if so, was the fact of the violation "clearly established" at the time? *Donovan v. City of Milwaukee,* 7 F.3d 944, 947 (7th Cir. 1994). That is, if no Fourth Amendment rights were violated in a given case, there is no need to determine whether the officer enjoys qualified immunity. However, if a reasonable jury could find that the officer violated plaintiff's Fourth Amendment rights, the court must address the issue of qualified immunity:

> An official sued under §1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was 'clearly established' at the time of the challenged conduct. . . . And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable officer in the defendant's shoes would have understood he was violating it. . . . <u>In other words, 'existing precedent must have placed the statutory or constitutional question' confronted by the official 'beyond debate.'</u> In addition, we have repeatedly told the courts not to define clearly established law at a high level of generality . . . since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Plumhoff v. Rickard,* 134 S.Ct. 2012, 2023 (2014). (emphasis added)

Recently, in *White v. Pauly,* 137 S. Ct. 548, 551-52 (2017), the Court emphasized that qualified immunity attaches when an officer's conduct does not violate "clearly established statutory or constitutional rights," which a reasonable person would have known:

> While the court's case law does not require a case directly on point, <u>for a right to be clearly established, 'existing precedent must have placed the statutory or constitutional question beyond debate. . . . In other words, immunity protects all but the plainly incompetent or those who knowingly violate the law.</u>

> In the last five years, this Court has issued a number of opinions reversing federal courts in qualified immunity cases. . . . This Court has found this necessary because . . . as an immunity from suit, qualified immunity is effectively lost if a case is erroneously permitted to go to trial. . . .

> Today, it is again necessary to reiterate the longstanding principle that clearly established law should not be defined at a high level of generality. [T]he clearly established law must be particularized to the facts of the case. . . .

> The [Court of Appeals] panel majority misunderstood the clearly established analysis. <u>It failed to identify a case where an officer under similar circumstances as Officer White was held to have violated the Fourth Amendment</u>. . . . [I]n the light of pre-existing law the unlawfulness must be apparent.
>
> <u>This is not a case when it was obvious there was a violation of clearly established law. . . [T]he majority did not conclude that White's conduct – such as a failure to shout a warning – constituted a run-of-the-mill Fourth Amendment violation. Indeed, it recognized that 'this case presents a unique set of facts and circumstances' . . . This alone should have been an important indication to the majority that White's conduct did not violate a 'clearly established' right.</u>

(emphasis added)  *See also Mullenix v. Luna,* 136 S. Ct. 305, 308-310 (2015) (A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right. . . . The dispositive question is whether the violative nature of the <u>particular</u> conduct is clearly established. . . . Such specificity is especially important in the Fourth Amendment context, where . . . it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. . . . The correct inquiry . . . was whether it was clearly established that the Fourth Amendment prohibited the officer's conduct in the situation she confronted - - whether existing precedent placed the conclusion that Mullenix acted unreasonably in the circumstances beyond debate. . . . [W]e cannot say that only someone plainly incompetent or who knowingly violates the law would have perceived a sufficient threat and acted as [defendants] did."); *Saucier v. Katz,* 533 U.S. 194, 205-209, (2001) ("The relevant dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted. . . . The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct . . . If the officers' mistake as to what the law requires is reasonable, however, the officer is entitled to the immunity defense. . . . Qualified immunity operates . . . to protect officers from the sometimes hazy border between excessive and acceptable

force . . ., and to ensure that before they are subjected to suit officers are on notice that their conduct is unlawful. . . . Qualified immunity can apply in the event the [officer's] mistaken belief was reasonable."); *City and County of San Francisco v. Sheehan*, 135 S.Ct. 1765, 1774, 1777 (2015) ("An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate. . . . This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those whoe knowingly violate the law. . . . So long as a reasonable officer could have believed that his conduct was justified, a plaintiff cannot avoid summary judgment by simply producing an expert's report that an officer's conduct leading up to a deadly confrontation was imprudent, inappropriate, or even reckless. . . . Considering the specific situation confronting [defendant officers], they had sufficient reason to believe their conduct was justified."); *Saffell v. Crews,* 183 F.3d 665, 658 (7th Cir. 1999)("A right is not clearly established if officers of reasonable competence could disagree on the issue…Qualified immunity is not forfeited unless no reasonable officer could have mistakenly believed that the conduct was unlawful."); *Upton v. Thompson*, 930 F.2d 1209, 1211-1212, (7th Cir. 1991)("Immunity should be applied unless it has been authoritatively decided that certain conduct is forbidden…Plaintiff must point to closely analogous cases decided prior to defendant's challenged actions."); *S.B. v. County of San Diego,* 2017 U. S. App. Lexis 8452 (9th Cir. May 17, 2017) (Fourth Amendment violation must be "run-of-the-mill" for qualified immunity to be lost).

    In the present case, Plaintiff bears the burden to establish that under the facts and circumstances known to Officers Hoffer and Ross at the time of their decision to employ deadly force, any and all reasonable police officers would have concluded that, under existing law, using

deadly force in this situation was unequivocally and absolutely prohibited. Defendants are aware of no case supporting the proposition that in a hostage situation such as this one, or in an analogous set of circumstances, it is unlawful to shoot an armed individual who is in the act of turning toward the officers with gun in hand, who the officers believe shot at them after proper police identification and warnings, and who would otherwise pose an imminent threat of death or serious bodily injury to the officers, and other officers in the vicinity. No case holds that in these circumstances, the officers cannot use deadly force unless the officer is <u>absolutely certain</u> that the individual is the one who previously fired at the officer after proper identification and warnings. Even if a reasonable jury could find it was unreasonable to shoot Mr. Funk, no existing law informed Officers Hoffer and Ross that using deadly force in these circumstances was categorically and unequivocally prohibited, i.e., that the wrongfulness of shooting Mr. Funk in these circumstances was "beyond debate," and that only an incompetent or murderous police officer could conclude otherwise.

The same is true with respect to Plaintiff's claim that Officers Hoffer and Ross violated Mr. Funk's Fourth Amendment rights by failing to issue additional warnings in the two to three second period between the time they first viewed Mr. Funk with his gun drawn, and his subsequent sideways movement in their direction, with gun in hand, thereby posing an imminent threat of death or serious bodily injury to themselves and other officers in the vicinity. Even if the court were to hold that a reasonable jury could find that it was unreasonable for Officers Hoffer and Ross to fail to warn Mr. Funk in this limited two to three second period, defendants are aware of no legal authority in existence at the time that informed Officers Hoffer and Ross, or any reasonable police officer, that a warning in these or similar circumstances was absolutely and unequivocally mandatory - - i.e., that if a police officer in a hostage situation, or similar circumstances, is not <u>absolutely certain</u> that an armed individual in the officers' immediate vicinity is a hostage-taker or participant in a police

ambush, who previously fired at the officers after warnings were given, the individual <u>must</u> be warned if it is physically <u>possible</u> to do so. No legal authority existing at the time of the incident rendered the necessity of such a warning beyond debate, or known to every police officer not otherwise incompetent. Here, as in *Pauly, supra,* 137 S. Ct. at 551-52, the failure to issue a warning in this case was hardly a "run-of-the-mill" Fourth Amendment violation. Like *Pauly*, this case "presents a unique set of facts and circumstances" precluding Plaintiff's ability to satisfy her burden to establish that Officers Hoffer and Ross violated Mr. Funk's "clearly established constitutional right" to another warning.

### III.    Defendants Are Immune From Plaintiff's State Law Claims.

Plaintiff alleges that Defendants are liable for intentional battery causing Mr. Funk's wrongful death, actionable under Wis. Stat. §§ 895.01, 895.03 and 985.04. Specifically, Plaintiff alleges that Officers Hoffer and Ross committed battery by shooting Mr. Funk, causing his wrongful death, and that their conduct was within the scope of their employment. (Am. Cmplt. ¶¶58, 59, 61, 62). In determining Defendants' potential liability for these claims, "the court must shift its focus from the reasonableness of the officers' actions to the nature of those actions. Specifically, the question is whether the officers' actions were ministerial or discretionary." *Liebenstein, supra,* 826 F.Supp. at 1187-88. Pursuant to Wis. Stat. §§ 839.80(4) and 893.80(5), Defendants are immune from any intentional tort action if the alleged tort was committed by Defendants Hoffer and Ross acting within the course of their employment, or while exercising their discretionary, as opposed to ministerial, functions. *See e.g. Scarpaci v. Milw. Co.,* 96 Wis. 2d 663, 680-83, 292 N.W.2d 816 (1980); *Maynard v. City of Madison*, 101 Wis. 2d 273, 279-82, 304 N.W.2d 163 (Ct. App. 1981); *Sheridan v. City of Janesville*, 164 Wis. 2d 420, 425-28, 474 N.W.2d 799 (Ct. App. 1991);

*Baranowski v. Milw.,* 70 Wis. 2d 684, 688-91, N.W.2d 279 (1975), *Salerno v. Racine,* 62 Wis. 2d 243, 247-49, 214 N.W.2d 446 (1972).

Because Plaintiff alleges that Officers Hoffer and Ross were acting within the scope of their official duties at all times relevant to this action, and because they were performing discretionary functions at the time they confronted Mr. Funk, Officers Hoffer and Ross are immune from liability, and are entitled to summary judgment dismissing Plaintiff's state law claims. See *Liebenstein, supra*, 826 F.Supp. at 1187-88.

Plaintiff asserts only an indemnity claim against the City of Neenah, which is therefore entitled to summary judgment as well.


**CONCLUSION**

In *Tennessee v. Garner* and *Graham v. Connor*, as well as numerous other Supreme Court decisions, the Court ruled that an officer may use deadly force in self-defense or in the defense of others if the suspect poses an immediate threat to the safety of the officers or the safety of others. The operative word is "threat," which denotes an indication of impending danger of harm. The law does not require an officer who immediately faces physical harm to wait before defending himself and others until the indication of impending harm ripens to the onslaught of actual physical injury or death. This distinction becomes crucial where, as here, a suspect is believed to have previously attempted to shoot the officers after proper identification and warnings. Officers Hoffer and Ross reasonably believed Mr. Funk presented such a threat of imminent harm in this case.

They also reasonably believed it was not feasible to attempt to warn Mr. Funk in the 2-3 seconds they had between the time they observed him with gun in hand and his beginning to turn in their direction. Given their belief that Mr. Funk had shot at them after prior warnings were given,

Case 1:16-cv-00978-WCG   Filed 07/14/17   Page 20 of 21   Document 23

and given his ability to shoot them and others in the vicinity if such an additional warning were given, proving another warning would have increased the risk of bloodshed; issuing another warning in this compressed time period was not constitutionally feasible.

Finally, even if a reasonable jury could possibly find that Officers Hoffer and Ross violated Mr. Funk's Fourth Amendment rights, Defendants respectfully submit that Officers Hoffer and Ross are immune from suit under the Qualified Immunity doctrine. No case in existence at the time of this incident unequivocally informed Officers Hoffer and Ross that the use of deadly force in these circumstances was prohibited - - a prohibition that was so beyond debate and clearly established, that only an incompetent or criminally minded officer could conclude otherwise.

Defendants respectfully request that the Court grant them summary judgment dismissing all of Plaintiff's claims.

Dated at Wauwatosa, Wisconsin, this 14th day of July, 2017.

GUNTA LAW OFFICES, S.C.
Attorneys for Defendants

By:    /s/ John A. Wolfgang
          Gregg J. Gunta, WI Bar No. 1004322
          Ann C. Wirth, WI Bar No. 1002469
          John A. Wolfgang, WI Bar No. 1045325
          Thomas Armstrong, WI Bar No. 1016529
          9898 W. Bluemound Road, Suite 2
          Wauwatosa, Wisconsin 53226
          T: (414) 291-7979 / F: (414) 291-7960
          Emails:      gjg@guntalaw.com
                     acw@guntalaw.com
                     jaw@guntalaw.com
                     tom@cabanisslaw.com