THERESA MASON-FUNK,
individually and in her capacity
as the Special Administrator of
the Estate of Michael L. Funk,

              Plaintiff,

      v.                                    Case No. 16-C-978

CITY OF NEENAH,
CRAIG HOFFER, and
ROBERT ROSS,

              Defendants.

## DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

      Plaintiff, Theresa Mason-Funk, brought this action under 42 U.S.C. § 1983, individually and in her capacity as the personal representative of the estate of her husband Michael Funk, seeking damages against Officers Craig Hoffer and Robert Ross of the Neenah Police Department (NPD) for the fatal shooting of her husband. She also asserts claims for battery and loss of society and companionship against the officers under Wisconsin's wrongful death statute. The City of Neenah, which is statutorily required to indemnify officers for liability arising out of acts performed in the course of their employment, is also named as a defendant. The Court has jurisdiction over Plaintiff's § 1983 claim under 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367. The case is before the Court on Defendants' motion for summary judgment. Defendants argue that the use of force used was reasonable under the circumstances and, alternatively, that they are immune from liability under federal and state law. For the reasons set forth, Defendants' motion will be granted.

**BACKGROUND**

This case arises out of the tragic consequences of a horrendous crime committed by Brian Flatoff on December 5, 2015. At approximately 8:35 a.m. on that day, Brian Flatoff entered Eagle Nation Cycles, a motorcycle shop located at 206 Main Street in the City of Neenah, Wisconsin, with a loaded MAC-10 machine pistol and took Michael Funk, Ryan Moderson, Ethan Moderson, and Michael Petersen hostage. Pl.'s Proposed Findings of Fact (PPFOF) ¶ 1, ECF No. 32. Flatoff instructed Ryan Moderson to call Vance Dalton, with whom Flatoff had a dispute, and tell him to come to the motorcycle shop immediately. After placing the call, Moderson kept the telephone line with Dalton open, and Dalton relayed information about the situation to local authorities.

At approximately 8:56 a.m., Winnebago County Dispatch notified the NPD about a weapons call at Eagle Nation and reported that a shot had been fired. Defs.' Proposed Findings of Fact (DPFOF) ¶ 1, ECF No. 24. The NPD alerted officers to the hostage situation and directed them to proceed to the scene. The responding officers included Lieutenant Shawn O'Bre; Officer Jonathan Kuffel, the NPD SWAT team leader; Officer Craig Hoffer, the assistant SWAT team leader; Officer Robert Ross; and Sergeant Angela Eichmann. Officers from the nearby City of Menasha Police Department also responded. PPFOF ¶ 12.

While en route to the scene, Lieutenant O'Bre learned there was a man inside Eagle Nation with a weapon and that he had several hostages. Beginning at 8:58 a.m., Officer Ross and other officers listening to the Main Channel dispatch learned that there were three possible hostages in the shop, that the hostage taker had a MAC-10 or MOC-10, and that the suspect was a white male with long hair and a beard, wearing a plaid jacket. DPFOF ¶¶ 8–12. The officers did not receive physical descriptions of any of the hostages. *Id.* ¶ 13.

Upon arrival at Eagle Nation, Lieutenant O'Bre advised area units to set up a perimeter around the shop. Shortly thereafter, dispatch informed the officers that an individual who was believed to be the shooter left the shop in a truck. Sergeant Eichmann and Officer Ross stopped the vehicle and identified the driver as Ethan Moderson, who left the shop undetected by Flatoff. Moderson confirmed that there was still a man in the shop with a gun. After the officers released Moderson, Lieutenant O'Bre asked Sergeant Eichmann to manage the perimeter and O'Bre began forming a "Hasty Team" consisting of Kuffel, O'Bre, Ross, Hoffer, and Lieutenant Tyrone Thompson to enter the shop if necessary. *Id.* ¶ 23. Officer Kuffel eventually took command of the Hasty Team.

At approximately 9:21 a.m., the officers learned that Flatoff had threatened to start shooting if Dalton did not show up to Eagle Nation within five minutes. *Id.* ¶ 25. Approximately 18 minutes later, at 9:39 a.m., dispatch reported that Flatoff was threatening to kill everyone if Dalton did not arrive in the next minute or so. *Id.* ¶ 28. Based on these facts, Officer Kuffel concluded it was necessary to forcibly enter the shop and prevent Flatoff from killing or seriously harming the hostages. At around 9:40 a.m. he began "stacking" the team into formation to enter Eagle Nation through the rear door from the alley on the south side of the building. *Id.* ¶ 30. He stacked the officers in the following order: Lieutenant Thompson with a shield as number one, Lieutenant O'Bre as the driver as number two, Officer Hoffer as number three, Lieutenant Kuffel as number four, and Officer Ross as number five. Officer Heiting trailed the team with a ram in case he needed to force the door open.

A dashboard camera on a squad car parked at the west end of the alley facing in an easterly direction (Squad 1 video) captured the outdoor events that occurred next. ECF No. 25-2. The Hasty Team entered the shop at 9:42:07 a.m. PPFOF ¶ 31. Motorcycles and other items were scattered

around the rear shop area, limiting the team's ingress.  Shortly after the team entered the shop, Lieutenant Thompson and Lieutenant O'Bre fell down a set of stairs just inside the doorway.  Upon entry, the officers called out in a loud voice: "Police," "get down," "get down on the ground right now," and "let me see your hands."  DPFOF ¶ 34.

At the time the Hasty Team entered Eagle Nation, Funk was seated at a desk facing the rear entrance and Flatoff stood close to Funk.  Funk dropped to the floor face down and Flatoff crawled behind Funk and began shooting at the Hasty Team.  A bullet struck Officer Hoffer's helmet above his right eye around 9:42:14 a.m. PPFOF ¶ 34.  Six seconds later, a bullet struck a fire extinguisher, releasing powder into the air and obscuring the officers' view.  The Hasty Team initially returned fire but then quickly withdrew from the shop at approximately 9:43:02 a.m.  *Id.* ¶ 36.

Once outside, the Hasty Team shouted into the shop, which was met with more gunfire. DPFOF ¶ 52.  Officers Kuffel and Hoffer thought at the time that there were no hostages inside Eagle Nation and instead believed the officers had walked into an ambush.  *Id.* ¶ 54.  In any event, Lieutenant O'Bre, Lieutenant Thompson, and Officer Kuffel retreated to Gord's Bar parking lot on the same side of the alley and to the west of Eagle Nation's rear entrance.  Officers Hoffer and Ross joined Sergeant Eichmann and two Menasha Police Department officers and retreated to the east side of Vicky's Beauty Salon across the alley and to the east of the motorcycle shop.

At approximately 9:45 a.m., Flatoff instructed Funk to close the shop's rear door, which the Hasty Team had left open, and warned Funk he would shoot him if he tried to escape.  PPFOF ¶ 61. Funk proceeded to the door, started to close it, but then dove out of the shop onto the ground outside.  *Id.* ¶ 63.  As he did so, Flatoff fired in his direction.  Once outside the shop, Funk scrambled behind a truck parked directly behind the shop in an apparent attempt to take cover from Flatoff in

4

the event he followed him out the door. From his position behind the truck and facing the door to the shop he had just exited, Funk drew his silver-colored handgun from his waistband holster and held it in both hands in a lowered position. *Id.* ¶¶ 65, 67.

In the meantime, upon hearing the shots Flatoff had fired at Funk when he dove out the door, Officers Hoffer and Ross moved back toward the alley and joined City of Menasha Police Officer Raymond Berna, who was stationed at the southeast corner of Vicky's Beauty Salon, where they could see the rear door of the motorcycle shop. *Id.* ¶ 73. By the time Officers Hoffer and Ross arrived at that position, Funk had already exited the shop and had drawn his pistol. DPFOF ¶ 88. As Funk turned in a counter-clockwise direction and began running away from the truck and across the alley at 9:45:38 a.m., Officers Hoffer and Ross fired at him, striking him first in the left hip and leg, and then continuing to strike him as he fell to the ground. PPFOF ¶ 78. Over a five-second period, Officer Hoffer fired eight shots, striking Funk twice, and Officer Ross fired eleven shots, hitting Funk with five. *Id.* ¶ 80.

From the time Funk exited Eagle Nation until he was shot, neither Officer Hoffer, Officer Ross, nor any other police officer gave him a warning or any sort of instruction. *Id.* ¶ 83. Officer Hoffer told Wisconsin Department of Justice investigators shortly after the incident that he thought he ordered Funk to show his hands, but he later conceded he did not do so. *Id.* ¶ 84. Officer Ross did not believe it was feasible to issue a warning to Funk between the time he first saw Funk with the gun in his hand and the time Funk began turning toward the officers. DPFOF ¶ 74. The only statement directed by the police to Funk after he entered the alley was given fourteen seconds after the officers finished shooting and Funk had stopped moving.

After Funk was down in the alley, Officer Hoffer and Sergeant Eichmann discussed whether an officer should retrieve Funk to provide medical attention. Officer Hoffer instructed the officers to leave Funk because "he could care less right now if he sits there and dies." PPFOF ¶ 97. Officer Hoffer contends he chose not to retrieve Funk because the officers did not have proper equipment and cover if Funk was lying on the ground merely waiting for an opportunity to shoot at them. DPFOF ¶ 79. Funk ultimately passed away as a result of the shooting.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

### A. Excessive Force

A claim that police officers have used excessive force "should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The

inquiry required to assess an excessive force claim involves "a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396. This inquiry is highly fact-intensive and "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citations omitted). The court's analysis of the objective reasonableness of an officer's actions must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* In excessive force claims, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97. Finally, "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

Had it been Flatoff, or someone aligned with Flatoff, that exited the shop, gun in hand, and after briefly scanning his surroundings, begun to turn in the direction of the officers while moving across the alley, the use of deadly force by Officers Hoffer and Ross would clearly have been justified. Only three minutes earlier, Flatoff had opened fire on police, striking Officer Hoffer in his helmet just above the eye, as the officers had attempted to enter the shop in an effort to rescue the hostages whom Flatoff had repeatedly threatened to kill. Having returned to the alley at the sound of more shots being fired, and seeing the perpetrator turning in their direction or attempting to flee between

7

the buildings across the alley from the shop, a reasonable police officer could justifiably conclude that deadly force was warranted.

Unfortunately, as we now know, the person who exited the shop minutes after Flatoff fired on police was not Flatoff or someone acting in concert with him. It was Funk, one of Flatoff's hostages. Officers Hoffer and Ross made a mistake, a tragic mistake, but it does not follow that they violated Funk's Fourth Amendment rights. *See Hill v. California*, 401 U.S. 797, 803–04 (1971) (holding that when police have probable cause to arrest one party and they reasonably mistake a second party for the first, then the arrest of the second party is valid). Thus, police have been held justified in using deadly force when they have reason to believe that a suspect is armed, even if it later turns out they were mistaken. *Slattery v. Rizzo*, 939 F.2d 213 (4th Cir. 1991) (holding deadly force reasonable where officer could have had probable cause to believe that suspect posed deadly threat even though suspect turned out to be unarmed); *see also Sherrod v. Berry*, 856 F.2d 802 (7th Cir. 1988) (*en banc*) (holding that under circumstances of case, fact that suspect was unarmed was irrelevant to excessive force claim where officer reasonably believed he was armed). Here, of course, Funk was armed, which unfortunately led the officers to conclude that he must have been the person, or one of the persons, who had just attempted to kill them and may have since killed his hostages.

The facts here are similar to those in *Milstead v. Kibler*, 243 F.3d 157 (4th Cir. 2001). In that case, police received a call from Mark Milstead that he and his fiancé were being attacked in their home by Steven Ramey, his fiancé's former boyfriend. The 911 operator also reported that a man had been shot in the neck and a woman stabbed. *Id.* at 160. Several officers, including Officer Chad Kibler, proceeded to the home where upon entry they encountered two men wrestling on the floor, one of whom immediately withdrew from the altercation and warned them that the other had a gun.

The person with the gun began firing, causing one of the officers who was backing up to fall onto a deck. Officer Kibler thought the officer had been shot and withdrew. Shortly thereafter, he heard a man, who he presumed was Ramey, say he was going to "kill all of you." *Id.* Seconds later someone came crashing through the door in a run and turned toward where Officer Kibler was positioned. Kibler fired two shots fatally wounding the person, realizing only later that he had shot Milstead and that he was unarmed. Ramey later shot himself in the head. *Id.* at 161.

In affirming the district court's decision granting summary judgment in favor of Officer Kibler on the excessive force claim brought by Milstead's estate, the Court of Appeals noted that "a mistaken understanding of the facts that is reasonable in the circumstances can render a seizure based on that understanding reasonable under the Fourth Amendment." *Id.* at 165. Under the circumstances facing him, the court concluded that Officer Kibler's mistaken belief that Milstead was in fact the perpetrator, rather than the victim, and that deadly force was justified was not unreasonable. Officer Kibler already knew that a female had been stabbed, Milstead had been shot in the neck, Ramey was armed and had apparently shot his fellow officer and threatened to kill all of the responding officers. Under these circumstances, it was reasonable to believe that the person crashing through the door was Ramey intent on carrying out his threat. Though Officer Kibler's mistake was tragic, the court observed that "courts cannot second guess the split-second judgments of a police officer to use deadly force in a context of rapidly evolving circumstances, when inaction could threaten the safety of the officers or others." *Id.* (citing *Graham*, 490 U.S. at 396–97); *see also Flynn v. Mills*, 361 F. Supp. 2d 866 (S.D. Ind. 2005) (granting summary judgment in favor of defendant officer who fatally shot innocent civilian he reasonably mistook for suspect).

The same reasoning applies here. Only three to four minutes earlier, police had been met with a barrage of gunfire as they attempted to rescue the hostages that Flatoff had threatened to begin killing within minutes. Indeed, Officer Hoffer had been struck in his helmet by a bullet. Officers Hoffer and Ross retreated behind the east wall of Vicky's Beauty Solon and only returned to the alley when they heard more shooting. By the time they arrived at the corner and saw him, Funk was already outside with his gun in hand and began turning counter-clockwise in their direction as he moved across the alley. The last thing they expected was that one of the hostages whose life Flatoff had been threatening for the last hour would be armed. In the split-second of time they had to make a decision before Funk was either out of their view or completely turned toward them, Officers Hoffer and Ross fired. Their mistake was tragic, but it was not unreasonable.

Plaintiff argues that the claim by Officers Hoffer and Ross that they were justified in using deadly force against Funk is objectively unreasonable for several reasons. First, Plaintiff argues that the view expressed by Officers Kuffel and Hoffer after the aborted attempt to enter the shop that it was not a hostage situation and was instead an ambush is unreasonable. Kuffel and Hoffer believed the situation was likely an ambush based upon several factors, including the number of obstacles in their path of entry, the people inside the shop seemed to be spread out with no one appearing distressed or responsive to police commands, most individuals were in positions of cover, and the amount of gunfire they encountered. Plaintiff notes that the ongoing report coming from the motorcycle shop was that Flatoff was the only hostage taker. She observes that the fact that Flatoff had a MAC-10 machine pistol capable of rapid, high volume fire explains the barrage of gunfire they were met with upon entry. Plaintiff also explains how Funk's actions during the aborted entry attempt were consistent with his hostage status. Pl.'s Mem. in Opp. at 15, ECF No. 33.

The fact that there may also exist innocent explanations for the observations of Officers Kuffel and Hoffer, however, does not make their suspicions unreasonable. It is not unreasonable to think that, if a lone gunman is holding a group of people as hostages, he would keep them close together. Nor is it unreasonable to think that people who had been held at gunpoint by a person who had made several threats to kill them over the last hour would appear anxious and distressed. We now know, of course, that the fusillade of gunfire that met them was caused by Flatoff's MAC-10, but in the heat of the moment and based on their experience, it seemed to Kuffel and Hoffer like more than one person was firing at them. Finally and more importantly, regardless of what Officer Hoffer may have thought about the hostages at the time he entered the shop, it was Funk's possession of a gun upon exiting the shop so soon after Hoffer and the other officers had been fired on that led Hoffer and Ross to conclude that Funk could not have been a hostage and was a threat to the safety of the officers.

Plaintiff also criticizes Officers Hoffer and Ross for failing to comply with police standards. For example, Plaintiff cites the "Priorities of Life" standard under which the lives of innocent hostages are to be given priority above those of police officers in responding to hostage situations. Plaintiff notes that "it is standard police practice in hostage situations to operate on the assumption that any individual involved in such a situation is innocent until reliable evidence shows that he is a suspect." Pl.'s Mem. in Opp. at 17. Plaintiff offers the reports of several experts to the effect that Officers Hoffer and Ross violated this and other standards in assuming that Funk was a threat and in using deadly force without first warning him to drop his gun.

The standards cited by Plaintiff provide little guidance in this particular situation, however. What is "reliable evidence" that a person is a suspect? Most of the standards cited do not speak to the specific situation where the potential suspect is armed. Under the circumstances in which they

11

found themselves, Officers Hoffer and Ross obviously thought the fact that Funk had just come out of the shop where minutes earlier police had been met with a barrage of gunfire, and was turning in a counter-clockwise motion in their direction with a gun in his hand was "reliable evidence" that he posed an imminent and deadly threat. Are they required to wait for more evidence in the form of the suspect completing his turn and firing at them before they are justified in using deadly force? If so, no federal court has yet to say so, which raises the question of good faith immunity discussed below.

For present purposes, it is enough to note that whether Officers Hoffer and Ross complied with police standards is not the issue. Indeed, in *Thompson v. City of Chicago*, the Seventh Circuit said that such standards are irrelevant: "What's more, this court has consistently held that 42 U.S.C. § 1983 protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices. . . . In other words, the violation of police regulations or even a state law is completely immaterial as to the question of whether a violation of the federal constitution has been established." 472 F.3d 444, 454 (7th Cir. 2006) (internal quotations and citations omitted); *see also Whren v. United States*, 517 U.S. 806, 815 (1996) (holding that internal police department rules are an unreliable guide to measuring the reasonableness of police conduct); *Scott v. Edinburg*, 346 F.3d 752, 760 (7th Cir. 2003) (holding that § 1983 "protects plaintiffs from constitutional violations, not violations of state laws or, in this case, departmental regulations and police practices").

Finally, Plaintiff argues from an analysis of the video evidence, including a disputed synchronization of the Squad 1 video with the video taken by the dashboard camera in Squad 8, that Officers Hoffer and Ross may have had as much as three to four seconds to assess the situation after they moved into the alley where they could see Funk before they began shooting. Although Funk was

already outside of the shop and had his gun in hand by that time, Plaintiff argues that a reasonable jury could rationally conclude that the officers were not entitled to use deadly force. "Given the standard police practice of using deadly force only as a last resort, (PPFF 91), and the fact that [Funk] never pointed his pistol at Hoffer and Ross (or any other officer) and did not run toward them, (PPFF 63-77), the jury could conclude that a reasonable officer, viewing [Funk's] actions during that span of three to four seconds, (PPFF 73-78), would have concluded that he or she did not have enough information to support use of deadly force and should refrain from using it." Pl.'s Mem. in Opp. at 21.

Having arrived at the tragically mistaken but reasonable conclusion that Funk was Flatoff or someone acting in concert with him, however, the officers needed to act quickly to prevent him from escaping or causing serious injury or death to others. In their view, he had already made clear that he was willing to use deadly force against police only minutes earlier when he fired on them repeatedly as they attempted to rescue the hostages that were being held in the shop. Despite this understanding, Officer Hoffer initially thought that he had first ordered Funk to show his hands before he fired. Officer Ross, on the other hand, thought any warning at the time was not feasible. In the view of Officers Hoffer and Ross, waiting longer would have put at risk their lives or the lives of others. Though they turned out to be wrong, in fact tragically wrong, their mistake was reasonable under the circumstances they confronted.

Plaintiff argues that the fact that neither Menasha Police Officer Berna nor Sergeant Eichmann fired their weapons supports her argument that the use of deadly force was not justified. Both testified by deposition, however, that they were not in a position to shoot. Officer Berna was holding a shield and would have been in Officer Hoffer's way had he stood up. Berna Dep. 50:25–51:5, ECF

No. 34-7. And Sergeant Eichmann testified that she lost sight of Funk when Ross arrived at her location. Eichmann Dep. 66:14–16, ECF No. 34-6. But even if they had elected not to shoot out of caution, it does not follow that Officers Hoffer and Ross were unreasonable in concluding immediate action was necessary.

This was not a case where police were confronted with a suicidal drunk seated in a lawn chair in his garage with a shotgun lying across his lap who voiced no threat to anyone but himself. *See Weinmann v. McClone*, 787 F.3d 444, 447 (7th Cir. 2015). In this case, police were confronting a dangerous hostage crisis in which they had just been met with a barrage of gunfire only moments before Funk emerged from the same location with, by the time Officers Hoffer and Ross saw him, his gun at the ready. In hindsight, we now know that Officers Hoffer and Ross were mistaken and that Funk was not the gunman who had shot at police. But as the courts have repeatedly emphasized, and as fairness demands, excessive force claims are not judged with the benefit of hindsight. Law enforcement officers are expected to act reasonably, not infallibly. Based on their mistaken but reasonable understanding of the circumstances they were facing, I conclude that the force used by Officers Hoffer and Ross was reasonable within the meaning of the Fourth Amendment. For completeness, however, I will also address Defendants' argument that they are entitled to good faith immunity.

## B. Qualified Immunity

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The doctrine shields government officials from civil liability

14

insofar as their conduct "'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and alteration omitted).

"Although qualified immunity is a defense to a § 1983 suit, the burden of meeting the elements of this two-part test rests on the plaintiff." *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999). In order to overcome a defense of qualified immunity, the plaintiff's allegations must describe a deprivation of a constitutional or statutory right and the right must be clearly established at the time of the defendants' conduct. *Saucier v. Katz*, 533 U.S. 194, 201–02 (2001). Although a plaintiff is not required to present a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al–Kidd*, 563 U.S. 731, 741 (2011); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (holding that officers violate clearly established law in novel factual circumstances when case law gives them "fair warning" that their conduct is unconstitutional).

In recent years, the Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality" and has reversed federal courts in qualified immunity cases where the lower courts "wrongly subject individual officers to liability." *City & Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775–76 & n.3 (2015) (quotation omitted); *see, e.g.*, *Carroll v. Carman*, 574 U.S. —, 135 S. Ct. 348 (2014) (per curiam); *Wood v. Moss*, 572 U.S. —, 134 S. Ct. 2056 (2014); *Plumhoff v. Rickard*, 572 U.S. —, 134 S. Ct. 2012 (2014); *Stanton v. Sims*, 571 U.S. —, 134 S. Ct. 3 (2013) (per curiam); *Reichle v. Howards*, 566 U.S. —, 132 S. Ct. 2088 (2012). In

*Sheehan*, the Court instructed: "An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in his shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate. This exacting standard gives government officials breathing room to make reasonable but mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Id.* at 1774 (quotation omitted).

In its most recent term, the Supreme Court reaffirmed this message in *White v. Pauly.* 137 S. Ct. 548 (2017) (per curiam). In that case, two officers responded to Samuel Pauly's house late one evening after receiving reports that Daniel Pauly, Samuel's brother, had been involved in a road-rage incident while intoxicated. *Id.* at 549. The officers demanded that the brothers come outside, but did not clearly identify themselves as police. *Id.* at 550. The two brothers armed themselves and yelled, "We have guns." *Id.* Officer White, who was not aware that the officers had not told the brothers they were confronting police, arrived at the house at the moment one brother shouted they had guns. He drew his weapon and took shelter behind a stone wall near the front of the house. A few seconds later, Daniel stepped out of the back door of the house and fired two shotgun blasts while screaming loudly. A few more seconds passed and Samuel opened a front window and pointed a handgun in Officer White's direction. One of the first officers shot at Samuel but missed. Four to five seconds later, Officer White shot and killed Samuel. *Id.*

Daniel brought suit against the officers, alleging that they used excessive force, and all three officers moved for summary judgment on qualified immunity grounds. *Id.* The district court denied qualified immunity, and the Court of Appeals for the Tenth Circuit affirmed. As to Officer White, the court held that a jury could have found that his use of deadly force was unreasonable, even

though he arrived late on the scene and did not participate in the events leading up to the armed confrontation. *Id.* at 551. It further decided that clearly established law existed at the time of Samuel's death notifying Officer White that a reasonable officer in his position would have believed that a warning was required despite the threat of serious harm. *Id.* The officers subsequently petitioned for certiorari.

Before engaging the qualified immunity analysis, the Supreme Court remarked: "[I]t is again necessary to reiterate the longstanding principle that 'clearly established law' should not be defined 'at a high level of generality.' As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case. Otherwise, '[p]laintiffs would be able to convert the rule of qualified immunity . . . into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.'" *Id.* at 552 (internal citations omitted) (alterations in the original). The Court went on to say:

> The panel majority [of the court of appeals] misunderstood the "clearly established" analysis: It failed to identify a case where an officer acting under similar circumstances as Officer White was held to have violated the Fourth Amendment. Instead, the majority relied on *Graham*, *Garner*, and their Court of Appeals progeny, which—as noted above—lay out excessive-force principles at only a general level. Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent. For that reason, we have held that *Garner* and *Graham* do not by themselves create clearly established law outside an obvious case.
>
> This is not a case where it is obvious that there was such a violation of clearly established law under *Garner* and *Graham*. Of note, the majority did not conclude that White's conduct—such as his failure to shout a warning—constituted a run-of-the-mill Fourth Amendment violation. Indeed, it recognized that this case presents a unique set of facts and circumstances in light of White's late arrival on the scene. This alone should have been an important indication to the majority that White's conduct did not violate a "clearly established" right.

*Id.* (internal citations omitted). The Court held that Officer White did not violate clearly established law, despite failing to provide a warning before using deadly force, in light of the "unique circumstances" surrounding Officer White's late arrival on the scene. *Id.* The Court reasoned that "clearly established federal law does not prohibit a reasonable officer who arrives late to an ongoing police action in circumstances like this from assuming that proper procedures" were followed before his arrival. *Id.* Accordingly, the Court found that Officer White was entitled to qualified immunity.

With this guidance in mind, the court must determine whether a constitutional rule applies with obvious clarity such that it placed the officers in this case on notice that their conduct was unlawful. Plaintiff relies on a collection of cases to demonstrate that the officers violated Funk's clearly established Fourth Amendment right to be free from excessive force. Although the cases relied upon by Plaintiff establish the contours of excessive force generally, none of these cases are factually similar to this case or define Funk's Fourth Amendment right with the specificity required by the Supreme Court. Stated differently, no controlling case law exists involving sufficiently similar circumstances that would have put Officers Hoffer and Ross on notice that what they did violated a clearly established right.

Plaintiff points to *Tennessee v. Garner* for the proposition that the use of deadly force is permissible only when an officer could have held an objectively reasonable belief that the suspect posed an imminent threat to the officer or others, and in such a situation, deadly force may be used to "prevent escape only if, where feasible, some warning has been given." 471 U.S. 1, 11–12 (1985). This case, however, is insufficient to put the constitutional question in this case "beyond debate." Again, the Supreme Court has chastised courts for relying on *Garner* to demonstrate that a defendant violated clearly established law because it only recites the basic principles of excessive force on a

general level. *See Pauly*, 137 S. Ct. at 552. Further, *Garner* is distinguishable on the facts because, in that case, an officer shot an *unarmed* suspect who ignored orders to stop fleeing after breaking into an unoccupied house, 471 U.S. at 3–4, whereas here, Funk was armed with a pistol and was leaving a shop where a shootout with police had occurred minutes earlier.

Plaintiff cites two additional cases where the victim of a police shooting was unarmed, *Wells v. City of Dayton*, 495 F. Supp. 2d 797 (S.D. Ohio 2006), and *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972 (D. Ariz. 2012), to support her contention that an officer's first duty is to protect hostages and that the officer must calibrate his acts to distinguish between hostage-takers and hostages. Both are district court decisions, however, and the Seventh Circuit has held that district court decisions cannot establish a constitutional right. *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir. 1995) ("[W]e agree with the Second Circuit that district court decisions cannot clearly establish a constitutional right." (citing *Jermosen v. Smith*, 945 F.2d 547, 551 (2d Cir. 1991)); *see also Boyd v. Owen*, 481 F.3d 520, 527 (7th Cir. 2007) (noting that "district court decisions have no weight as precedents and therefore cannot clearly establish a constitutional right"). Even aside from this, both cases are readily distinguishable.

The events in *Wells* did not involve a hostage situation. In that case, Harold Wells accompanied his friends to the residence of Shawn Robinson, without knowing that police were en route to Robinson's apartment as a result of Robinson placing a firearm to a woman's head earlier that evening. 495 F. Supp. 2d at 800. Two officers arrived at the apartment and heard multiple male voices inside. When the officers knocked on the door, Robinson opened the door and shot Officer Cornwell, striking his body armor. *Id.* at 801. After Robinson shot Officer Cornwell, Cornwell looked through the open door and saw Wells standing next to a couch. Wells' hands were empty and

were outside of his pockets, he did not possess a weapon, and he did not move or approach the officers. Nevertheless, Officer Cornwell fired two shots at Wells, killing him. Approximately five seconds passed between the time that Robinson shot the officer and the officer shot Wells, and only about one second passed between the time that the officer entered the doorway and shot Wells. *Id.* The district court concluded that, construing the evidence in the light most favorable to the plaintiff, Wells did not present a risk of harm to either officer or to anyone else. *Id.* at 813. It noted that Officer Cornwell fired shots without affording Wells any opportunity of surrendering. Accordingly, the court concluded that Officer Cornwell was not entitled to qualified immunity. *Id.*

Plaintiff's second case, *Hulstedt v. City of Scottsdale*, involved a situation where the plaintiff, an unarmed man, held his infant daughter hostage and threatened to "pile drive" her into the ground if the officers did not send his brother into the house. 884 F. Supp. 2d at 985. Shortly thereafter, the plaintiff began approaching the officers surrounding him with his daughter raised above his head, looked directly at one of the officers, then turned around and walked back to his house. *Id.* at 986. As he walked away, an officer shouted, "Put that child down!" Within seconds of issuing the command, two officers opened fire and shot the plaintiff in the back three times. *Id.* The shooting caused the plaintiff to drop his daughter, causing her to sustain a temporal skull fracture, and rendered the plaintiff a paraplegic. *Id.* at 987. The district court found that even if the shooting had been justified, the officers' use of force was excessive because both officers shot at the plaintiff without issuing a warning, although such a warning was "feasible." *Id.* at 998. The court rejected the officers' argument that the plaintiff's prior threats toward his daughter made the danger he posed to her imminent and justified their use of deadly force. It reasoned, "When he was shot, David was not armed and was walking away from police officers. He was holding his daughter above his head

and thus was not otherwise free to use his hands. He was not looking at police but walking slowly back towards his house. When David was in such a posture, no reasonable officer could have believed that David posed a threat to the police or to the general public." *Id.* at 993. The court held that "no reasonable officer could have believed that shooting David without warning, while he calmly walked back towards his house with D.H. over his head, was a proper means of protecting D.H.'s safety." *Id.* at 999.

Neither case adequately warns the officers in the instant case that their conduct violated a constitutionally-protected right because they do not remotely involve a situation similar to the instant case simply by virtue of the fact that the individuals in these cases were unarmed when the officers opened fire. Here, the parties do not dispute that Funk was armed with a pistol at the time he was shot, and he had just emerged from a building in which hostages were being held at gunpoint and one or more perpetrators had opened fire on police as they attempted a rescue operation. This alone is enough to establish that these cases do not "squarely govern" the factual circumstances present here. *Brosseau v. Haugen*, 543 U.S. 194, 201 (2004).

Plaintiff also references cases holding that the use of deadly force is unconstitutional when an individual, though armed, is not pointing his gun at the officer and there is no other indicia of an imminent threat. But again, these cases are not factually similar to the instant case. In *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013), after a long afternoon of drinking and using drugs, Cooper got into a heated argument with his cousin at his home, resulting in a neighbor calling the police. *Id.* at 155. The officers arrived at the house around 11:30 p.m. and tapped on Cooper's window, though they did not identify themselves as police. Cooper peered out the back door and called out for anyone in the yard to identify himself, but the officers did not respond. *Id.* Cooper emerged from

the door carrying a shotgun, which he had pointed toward the ground. When the officers realized Cooper had a gun, they began shooting at him without advancing a warning. *Id.* at 156. Cooper felt two bullets hit his body and turned toward the back door. The officers continued shooting until Cooper collapsed to the ground. *Id.* The court held that by firing on Cooper without giving a warning, the officers violated his clearly established "right to be free from deadly force when posing no threat." *Id.* at 160. While the court acknowledged that "the mere possession of a firearm by a suspect is not enough to permit the use of deadly force," it noted that "an armed suspect need not engage in some specific action—such as pointing, aiming, or firing his weapon—to pose a threat." *Id.* at 159 & n.9. The court concluded that, because Cooper made no sudden movements or threats and ignored no commands, a reasonable officer would not have had probable cause to feel threatened by Cooper. *Id.* The court also found it significant that the officers never identified themselves, and that no reasonable officer could have believed that Cooper was aware that the officers were present when he stepped outside with his gun. *Id.* at 159–60.

In *Baker v. Putnal*, 75 F.3d 190 (5th Cir. 1996), officers patrolling a beach heard gunfire and received reports that a red car parked on the beach contained the shooters. As Officer Putnal neared the car, he noticed Wendell Baker and another man sitting in a truck nearby. Officer Putnal approached the truck, and Baker, who was sitting in the passenger's seat, turned in the officer's direction. Officer Putnal shot and killed Baker. Afterwards, the police recovered a pistol under the truck's passenger seat. *Id.* at 193. The district court granted Officer Putnal's motion for summary judgment. *Id.* at 194. The Fifth Circuit reversed, finding that there were too many factual issues to permit the plaintiffs' claims to be disposed of on summary judgment. *Id.* at 198. The court was concerned that the location of Baker's wounds indicated he was not facing the officer when he was

shot, that Baker did not provoke Putnal or know that the officer approached the truck, and that the officer did not say anything to Baker before he turned to the officer. *Id.*

In *Weinmann v. McClone*, the plaintiff was arguing with his wife and then went out to his garage, drank half a bottle of vodka, and threatened to kill himself with a shotgun. 787 F.3d at 446. His wife called the police, and Deputy McClone responded to the call. Upon arrival, Deputy McClone peered into the garage through two garage windows but did not see Weinmann. He knocked on the door to the garage, but did not receive a response. Deputy McClone made no attempt to speak with Weinmann through the door and instead decided to make an unannounced entry into the garage by kicking the door in. The parties disputed what occurred next. According to Weinmann, whose version was presumed true at that stage of the proceedings, he sat in a lawn chair with the shotgun across his lap and rested his arms on the armrests or held just above them. *Id.* at 447. Upon entry, Deputy McClone opened fire on Weinmann, hitting him four times. *Id.* The court concluded it was objectively unreasonable for Deputy McClone to believe he was in imminent danger and that "[k]icking down a door and immediately shooting a suicidal person who is neither resisting arrest nor threatening anyone save himself is an excessive use of force." *Id.* at 449, 451. It held, in addition, that existing precedent clearly established that a suicidal person had a right to be free from the use of deadly force unless he threatened to harm others. *Id.* at 451.

Again, these cases are factually distinguishable from the case at hand. Most importantly, the victims' conduct in Plaintiff's cases do not suggest that they posed a threat to the officers or the public at large. They made no sudden movements, made no threats to officers, and ignored no police commands. Importantly, in these cases, the officers did not identify themselves as law enforcement before they opened fire—they did not warn the victims that officers would use deadly force or give them an opportunity to surrender, even though the victims posed no present threat of danger.

By contrast, Officers Hoffer and Ross in the instant case were confronted with an active hostage situation. Although they were told there were at least three hostages in Eagle Nation, they did not get any information about the hostages' identities or a description of their appearances. The gunman inside the shop had already threatened to kill the hostages if Dalton did not show up, which clearly was not going to occur. Police were told that the suspect was armed with a gun, and the responding officers and had already been fired upon by what they believed to be more than one person. When Funk appeared outside moments later after additional gunfire was heard coming from the shop, armed with a pistol and looking around in a manner suggesting that he was looking for a target, police reasonably concluded he was the person, or one of the persons, who had shot at them earlier and was likely to do so again. In short, the facts in this case are substantially different from those in Plaintiff's collection of cases. Plaintiff's cases are "inherently incapable of giving fair and clear warning" to Officers Hoffer and Ross that they violated a clearly established right. *Pauly*, 137 S. Ct. at 552. For these reasons, Defendants are entitled to qualified immunity as to Plaintiff's § 1983 claim for excessive force.

## II. State claims

Plaintiff has also asserted state law claims against Defendants. Retention of a plaintiff's state law claims is contrary to the usual practice. Under 28 U.S.C. § 1367(c), district courts may decline to exercise supplemental jurisdiction over state law claims once all the federal claims have dropped out of the case. *See also Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after dismissing every claim over which it had original jurisdiction is purely discretionary."). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before trial*, the district court should

relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007) (emphasis in original); *see also Groce v. Eli Lilly & Co.*, 193 F.3d 496, 502 (7th Cir. 1999) (noting that the rule is dismissal unless state claims are frivolous or a "no brainer"). Nothing in this case suggests that the presumption should be ignored. Accordingly, Plaintiff's state law claims will be dismissed without prejudice.

## CONCLUSION

Accordingly, for the reasons set forth above, it is hereby ordered that Defendants' motion for summary judgment (ECF No. 22) is **GRANTED** with respect to the federal claims, and such claims are **DISMISSED**. It is further ordered that the remaining state law claims are **DISMISSED** without prejudice. The Clerk is directed to enter judgment forthwith.

Dated this  1st  day of November, 2017.

s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court